**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE NOV 2 3 2016

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on NOV 23, 2016

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| AVNET, INC., | ) | No. 92080-0 |
| Petitioner, | ) ) ) | |
| v. | ) | En Banc |
| WASHINGTON DEPARTMENT OF REVENUE, | ) ) ) ) | |
| Respondent. | ) ) | Filed NOV 2 3 2016 |

MADSEN, C.J.—Avnet Inc. is a New York corporation, headquartered in Arizona, and is a major distributor of electronic components and computer technology worldwide. Avnet sells products through its headquarters in Arizona and through its many regional sales offices, including one in Redmond, Washington. Following an audit, the Washington State Department of Revenue (Department) determined that from 2003 to 2005, Avnet underreported its business and operations (B&O) tax liabilities by failing to include its national and drop-shipped sales in its tax filings. "National sales" are delivered to a Washington facility owned by Avnet's customer, even though the customer placed the order from an office outside Washington. "Drop-shipped sales" are slightly

different in that they are delivered to a third party in Washington at the request of Avnet's customer—usually Avnet's buyer's customer. This case requires us to evaluate whether national and drop-shipped sales are subject to Washington's B&O tax under the dormant commerce clause and the Department former "Rule 193" (i.e., former WAC 458-20-193 (1992)). U.S. CONST. art. I, § 8, cl. 3. We hold that neither the dormant commerce clause nor Rule 193 bar the imposition of a B&O tax to Avnet's national and drop-shipped sales delivered in Washington.

## FACTS

Avnet is "one of the largest distributors of electronic components, computer products and embedded technology serving customers globally." Clerk's Papers (CP) at 424; see also CP at 194-95. From 2003 through 2005, Avnet earned more than $200 million in revenue from its wholesale of goods shipped into Washington from an out-of-state warehouse. Approximately $80 million of its gross receipts came from national and drop-shipped sales. In a "national sale," Avnet makes a wholesale sale to a customer with branch offices in multiple states. The products are delivered to the customer at its Washington branch, but the goods are billed to the customer's out-of-state office. For example, a corporation purchases products for delivery to its offices in Seattle, Washington, but directs Avnet to send the bill to its corporate headquarters in Delaware. In a "third-party drop shipment" or "drop shipment," an out-of-state customer places a wholesale order and directs Avnet to deliver the product to its customer in Washington. For example, a Montana corporation places an order with Avnet and—instead of having

2

it shipped to Montana and then reshipping it to Spokane—directs that it be delivered to its customer in Spokane.

Avnet has 35 offices in the United States, including an office in Redmond, Washington. Although all of Avnet's products ship from distribution centers outside Washington, there is no difference between the products ordered through the Arizona branch or the Washington branch, and the staff in the Redmond office are able to serve its Washington customers whose orders are placed elsewhere. During the relevant period, Avnet employed over 40 employees at its branch office in Redmond, Washington. Although the Redmond office was not involved in the specific national and drop-shipped sales at issue, its presence and business activities in Washington was extensive. Of the over 40 employees, 16 to 18 were account managers who managed customer account portfolios that were each estimated to generate $4 million in annual sales revenue. The Redmond branch also employed sales and marketing representatives, engineers, and technology consultants. Avnet's Washington employees were instrumental in marketing and selling products, establishing and improving customer relations, providing design services to help with the development of new products, and offering technical and engineering support to its Washington customers.

The Department audited Avnet's taxes and concluded that from 2003 to 2005, Avnet underreported its B&O tax liabilities. In particular, the Department found Avnet failed to include national and drop-shipped sales in its tax filings. The Department auditor assessed Avnet $556,037 in taxes and interest. Avnet appealed to the

administrative appeals division of the Department. The appeals division affirmed the Department's tax assessment. Avnet paid the tax assessment under protest and filed a refund action in Thurston County Superior Court. The superior court ruled that the national sales, but not the drop-shipped sales, were subject to the B&O tax. Both Avnet and the Department cross appealed the superior court's ruling. The Court of Appeals held that Avnet's B&O tax liability included both national and drop-shipped sales. *Avnet, Inc. v. Dep't of Revenue*, 187 Wn. App. 427, 448-49, 348 P.3d 1273 (2015).

Avnet petitioned this court for review, which we granted. *Avnet, Inc. v. Dep't of Revenue*, 184 Wn.2d 1026, 364 P.3d 120 (2016). Avnet argues that the dormant commerce clause bars the imposition of a B&O tax on its national and drop-shipped sales into Washington, which do not utilize the Redmond office in the placing or completion of the sale. Alternatively, even if the taxes are constitutionally permissible, Avnet maintains that under these facts, Rule 193 prevented the Department from assessing the taxes. At issue is whether Avnet carried its burden of proving that its national and drop-shipped sales are sufficiently dissociated from its in-state activities to avoid B&O tax liability by showing that its Redmond office played no part in the sales. Additionally, we must determine whether Rule 193 barred the B&O taxes and, if so, whether the Department was bound to follow an interpretive rule.

We hold that merely showing that an in-state office was not involved in the placing or completion of a national or drop-shipped sale is insufficient to dissociate from the bundle of in-state activities that are essential to establishing and holding the market

for its products. We also hold that under the plain language of Rule 193, imposition of the B&O taxes to Avnet's national and drop-shipped sales was proper, and therefore decline to address whether an agency is bound by its interpretive rules.

## STANDARD OF REVIEW

Questions of law on appeal from summary judgment are reviewed de novo. *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004) (citing *Rivett v. City of Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994)). We interpret statutes so as to implement the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "When its meaning is in doubt, a tax statute 'must be construed most strongly against the taxing power and in favor of the taxpayer.'" *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 842-43, 246 P.3d 788 (2011) (quoting *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992)). However, courts presume taxes are valid. *Id.* at 843. Avnet therefore bears the burden of proving an exemption applies. *Id.*; RCW 82.32.180 ("the burden shall rest upon the taxpayer to prove that the tax as paid by the taxpayer is incorrect"); *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 441, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964) ("'a taxpayer claiming immunity from a tax has the burden of establishing his exemption.'" (quoting *Norton Co. v. Dep't of Revenue*, 340 U.S. 534, 537, 71 S. Ct. 377, 95 L. Ed. 517 (1951))), *overruled on different grounds by Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987). If there is ambiguity in a provision providing an exemption or deduction, the court must strictly construe the

provision against the taxpayer. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149-50, 3 P.3d 741 (2000).

## ANALYSIS

### Washington's B&O Tax Structure

Washington imposes a gross receipts, or B&O, tax on wholesalers "for the act or privilege of engaging in business activities." Former RCW 82.04.220 (1961);[1] *see also Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 39, 156 P.3d 185 (2007). Every person who conducts business activities in Washington "with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly" and who "has a substantial nexus with this state" must pay a percentage of its gross receipts of any resulting proceeds. Former RCW 82.04.140 (1961); former RCW 82.04.220; *Lamtec*, 170 Wn.2d at 843. This court has held that "it is obvious that the legislature intended to impose the business and occupation tax upon virtually all business activities carried on within the state." *Time Oil Co. v. State*, 79 Wn.2d 143, 146, 483 P.2d 628 (1971). The B&O tax is to be imposed as broadly as constitutionally allowed. *See Coast Pac. Trading, Inc. v. Dep't of Revenue*, 105 Wn.2d 912, 917-18, 719 P.2d 541 (1986) ("This court has ruled repeatedly that when the Legislature enacted the business and occupation tax the Legislature intended 'to tax all business activities not expressly excluded'."

---

[1] In 2010, the legislature rewrote this provision to read:
> There is levied and collected from every person that has a substantial nexus with this state a tax for the act or privilege of engaging in business activities. The tax is measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be.

LAWS OF 2010, 1st Spec. Sess., ch. 23, § 102. We do not consider the impact, if any, of the revision of the statute.

(quoting *Rena-Ware Distribs., Inc. v. State*, 77 Wn.2d 514, 517, 463 P.2d 622 (1970))); RCW 82.04.4286 ("In computing tax there may be deducted from the measure of tax amounts derived from business which the state is prohibited from taxing under the Constitution of this state or the Constitution or laws of the United States."); *see also Steven Klein, Inc. v. Dep't of Revenue*, 183 Wn.2d 889, 896, 357 P.3d 59 (2015).

For wholesale sales, the statute imposes a B&O tax "equal to the gross proceeds of the sales of such business multiplied by the rate of 0.484 percent." RCW 82.04.270. The statute defines "sale" as "any transfer of the ownership of, title to, or possession of property for a valuable consideration." RCW 82.04.040(1). The Department's administrative rule, WAC 458-20-103, also defines when a sale takes place:

> For the purpose of determining [B&O] tax liability of persons selling
> tangible personal property, a sale takes place in this state when the goods
> sold are delivered to the buyer in this state, irrespective of whether title to
> the goods passes to the buyer at a point within or without this state.

"A tax on an out-of-state corporation must satisfy both the requirements of the due process clause of the Fourteenth Amendment and the commerce clause." *Lamtec*, 170 Wn.2d at 843 (citing *Quill Corp. v. North Dakota*, 504 U.S. 298, 305, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992)). Avnet challenges the imposition of the tax under only the dormant commerce clause.

The dormant commerce clause "prevents state regulation of interstate commercial activity even when Congress has not acted . . . to regulate that activity" but does not "relieve those engaged in interstate commerce from their just share of state tax burden." BLACK'S LAW DICTIONARY 325 (10th ed. 2014) (see subentry for "commerce clause");

*W. Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S. Ct. 546, 82 L. Ed. 823 (1938). Under modern dormant commerce clause jurisprudence, a state tax on an out-of-state corporation must (1) be "applied to an activity with a substantial nexus with the taxing State," (2) be "fairly apportioned," (3) "not discriminate against interstate commerce," and (4) be "fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977); *see also Ford*, 160 Wn.2d at 48-49. "If a local taxing scheme fails any one of these four requirements, it is invalid." *Ford*, 160 Wn.2d at 48. The parties disagree as to whether the first requirement—a "substantial nexus" between Avnet's national and drop-shipped sales and the activities of its Redmond office—has been satisfied.[2]

In addition to the dormant commerce clause requirements, the Department has promulgated administrative rules interpreting the B&O tax statute. Relevant here is Rule 193, former WAC 458-20-193, which was applicable at the time of the events at issue. Rule 193 explains Washington's B&O tax and its application to inbound and outbound sales. Rule 193(7) discusses inbound sales and states that "Washington does not assert B&O tax on sales of goods which originate outside this state unless the goods are received by the purchaser in this state and the seller has nexus." Further,

---

[2] The dissent draws a distinction between "business nexus" and "transactional nexus" as two separate but interrelated tests. Dissent at 8 (citing *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 441, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964)). *General Motors*, however, draws no such distinction, and in our review of the case law, no other cases use the terms "business" and "transactional" when evaluating the nexus necessary in a dormant commerce clause analysis. The dissent also asserts that our reliance on *Tyler Pipe* and *Lamtec* is misplaced because both of those cases are about business nexus, not transactional nexus. Dissent at 11-12. But again, neither *Tyler Pipe* nor *Lamtec* distinguish between a "business" and a "transactional" nexus.

> [i]f a seller carries on significant activity in this state and conducts no other business in the state except the business of making sales, this person has the distinct burden of establishing that the instate activities are not significantly associated in any way with the sales into this state. Once nexus has been established, it will continue throughout the statutory period of RCW 82.32.050 (up to five years), notwithstanding that the instate activity which created the nexus ceased.

Rule 193(7)(c). Rule 193(7)(c) goes on to provide a nonexhaustive list of circumstances that would establish that the B&O tax applies to certain sales. Among those, Rule 193(7)(c)(v) states that

> [t]he out-of-state seller, either directly or by an agent or other representative, performs significant services in relation to establishment or maintenance of sales into the state, even though the seller may not have formal sales offices in Washington or the agent or representative may not be formally characterized as a "salesperson".

Rule 193(2)(d) specifies that "'[r]eceipt' or 'received' means the purchaser or its agent first either taking physical possession of the goods or having dominion or control over them." "Agent" is defined as "a person authorized to receive goods with the power to inspect and accept or reject them," Rule 193(2)(e), and "nexus" is defined as "the activity carried on by the seller in Washington which is significantly associated with the seller's ability to establish or maintain a market for its products in Washington." Rule 193(2)(f). Avnet contends that it has established that its national sales are exempt from taxation under Rule 193(7)(c) because none of its in-state activities were significantly associated in any way with the sales at issue. Avnet further argues that its drop-shipped sales are exempt under Rule 193(7) because Avnet's customer, the wholesale buyer, did not take physical possession of or exercise dominion and control over the goods in

9

Washington, and that only Avnet's buyer's customer received the goods within the meaning of the rule.

Dormant Commerce Clause

We turn first to Avnet's constitutional argument. Avnet asserts that it is entitled to "dissociate" the contested inbound sales from the tax base because the Redmond office was not involved in any way in those sales, i.e., the orders were placed directly with the company's headquarters in Arizona and the Redmond office was not involved in fulfilling those sales. Avnet's commerce clause challenge rests entirely on the Supreme Court's 1951 decision in *Norton Co. v. Department of Revenue*, 340 U.S. 534, 538-39, 71 S. Ct. 377, 95 L. Ed. 517 (1951). According to Avnet, *Norton* dictates—on substantially similar facts—that Washington cannot impose a B&O tax on such national and drop-shipped sales.

The question in *Norton* was whether the dormant commerce clause prohibited Illinois from imposing a B&O tax on certain out-of-state sales. *Norton*, 340 U.S. at 535-36. Norton manufactured abrasive machines and supplies in Massachusetts. It also employed engineers in Illinois to consult with prospective customers. *Norton Co. v. Dep't of Revenue*, 405 Ill. 314, 315, 90 N.E.2d 737 (1950). These engineers did not solicit or take any sales orders. *Id.* Nor did Norton employ any salespeople in Illinois. *Id.* Norton did, however, operate a local retail branch office and warehouse there. *Norton*, 340 U.S. at 535. Norton did not dispute Illinois's ability to tax sales it made at its Illinois branch. But not all sales to Illinois customers were completed at the Illinois

10

branch. Some were placed at the Illinois branch but were forwarded to the Massachusetts office for acceptance or rejection. *Id.* at 536. Other orders were made directly to the Massachusetts office and shipped from Massachusetts without involvement of the Illinois branch or warehouse. *Id.* Norton challenged Illinois's B&O tax on those sales accepted and shipped from its Massachusetts office.

The Court concluded that Illinois could impose a B&O tax on all sales that utilized the Illinois branch or warehouse, either in receiving the order or distributing the goods. *Id.* at 538. But the Court found that the orders that were sent directly to Massachusetts by the customer and shipped directly to the customer from Massachusetts were "so clearly interstate in character" that Illinois could not reasonably attribute their proceeds to the local business. *Id.* at 539 ("Income from those [sales] we think was not subject to this tax.").[3] According to the Court, "when, as here, the corporation has gone into the State to do local business by state permission and has submitted itself to the taxing power of the State, it can avoid taxation on some Illinois sales only by showing that particular

---

[3] That same year we decided *B.F. Goodrich Co. v. State*, 38 Wn.2d 663, 231 P.2d 325 (1951). We applied *Norton* and ruled that two classes of sales fell outside the reach of our state's B&O tax. *Id.* at 674. The first class (class E sales) involved mail orders sent to Goodrich's out-of-state office for products sold exclusively through its out-of-state salespeople and stored in its out-of-state facilities. *Id.* at 666. The second class (class F sales) involved sales made and fulfilled pursuant to a contract negotiated with a national corporation outside Washington. *Id.* Because neither class of sales involved orders sent to or fulfilled by a local office or salesperson, this court felt "compelled" to hold that a B&O tax on either class of sales would offend the dormant commerce clause as interpreted by *Norton*. *Id.* at 674. We concluded that "such a tax may not be levied upon the proceeds from sales with which the *local outlet* had nothing to do." *Id.* at 675 (emphasis added). We have since clarified the meaning of *B.F. Goodrich*, explaining that the relevant "local outlet" should not be construed narrowly. *Chi. Bridge & Iron Co. v. Dep't of Revenue*, 98 Wn.2d 814, 833, 659 P.2d 463 (1983).

transactions are dissociated from the local business and interstate in nature." *Id.* at 537. The Court then announced the test for dissociation that it has continued to apply: whether the taxpayer's in-state activities helped establish and maintain a market for the taxpayer's goods.

In the over 60 years since *Norton*, the Supreme Court has addressed the issue of dissociation under *Norton* several times. *See, e.g., Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 249, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987); *Standard Pressed Steel Co. v. Dep't of Revenue*, 419 U.S. 560, 562-63, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975); *Gen. Motors*, 377 U.S. at 447-48.[4] The parties and amici dispute whether the legal rule set forth in *Norton* has changed or the facts of the cases have changed.

*General Motors*, like *Norton*, involved a challenge to Washington's authority to impose a B&O tax on sales sent directly to General Motors' (GM) Portland office where they were accepted and delivered directly to dealers in Washington. *Gen. Motors*, 377 U.S. at 443. Like Norton, GM also hired local employees and had a branch office in Seattle, and neither the employees nor the branch office were involved in the disputed sales. *Id.* at 446. The Court nevertheless upheld the tax on sales received by the Portland office and delivered to Washington dealers. According to the Court, there was a sufficient nexus between GM's "bundle of corporate activity" in Washington to satisfy imposition of its B&O tax to these sales. *Id.* at 447-48. The Court reasoned:

> Although mere entry into a State does not take from a corporation the right
> to continue to do an interstate business with tax immunity, it does not

---

[4]*Overruled on different grounds by Tyler Pipe*, 483 U.S. at 242-48 (holding Washington's tax exemption for "multiple activities" discriminates against interstate commerce).

> follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain that same degree of immunity.

*Id.* at 448.

*Standard Pressed Steel* also involved a challenge to Washington's B&O tax. There, the Department levied the tax on sales made to an in-state customer (Boeing) directly from Standard Press Steel (SPS), an out-of-state manufacturer, where SPS accepted and filled the sales, and shipped the products directly to the Washington customer. 419 U.S. at 561. And like the company in *Norton*, SPS hired an in-state engineer to consult with customers, but that engineer was not involved in the subject sales. *Id.* at 561. Despite the striking similarities between the sales in *Standard Pressed Steel* and the sales in *Norton*, the Court unanimously found that Washington's B&O tax on SPS's inbound sales to Boeing was constitutional. *Id.* at 561-62. The Court specifically rejected SPS's contentions (much like Avnet's contentions here) that *Norton* controlled. *Id.* at 563. Instead, the Court analogized the facts of *Standard Pressed Steel* to those in *General Motors* and affirmed application of Washington's B&O tax.

Despite their different outcomes, neither *Standard Pressed Steel* nor *General Motors* explicitly overruled *Norton*. To the contrary, each decision suggested that its analysis of whether the taxpayer had sufficiently dissociated its sales from its efforts to establish and maintain a market for sales in the taxing state was consistent with *Norton*. *See Standard Pressed Steel*, 419 U.S. at 562-63; *Gen. Motors*, 377 U.S. at 440-48.

13

Finally, in *Tyler Pipe*, the Supreme Court found Washington could impose a B&O tax on Tyler Pipe's sales in Washington even though it had no office, no property, and no employees in Washington. 483 U.S. at 249-51. The Court found application of a B&O tax to these sales did not offend the commerce clause because Tyler Pipe had hired an in-state contractor to call on customers and solicit orders, and that it was through these sales contacts that Tyler Pipe maintained and improved its "'name recognition, market share, goodwill, and individual customer relations.'" *Id.* (quoting *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 105 Wn.2d 318, 325, 715 P.2d 123 (1986), *vacated*, 483 U.S. 232). According to the Court, these local activities were necessary for the maintenance of Tyler Pipe's market in Washington and protection of its interests there. *Id.* at 250-51. In so holding, the Supreme Court adopted this court's formulation of the nexus test: "'[T]he crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" *Id.* at 250 (quoting *Tyler Pipe*, 105 Wn.2d at 323).

This court's B&O cases are consistent with the Supreme Court's interpretation of *Norton*. In *Chicago Bridge & Iron Co. v. Department of Revenue*, Chicago Bridge, an Illinois corporation, was in the business of designing and installing custom steel containers in Washington. 98 Wn.2d 814, 816-17, 659 P.2d 463 (1983). At issue was whether Washington could impose its B&O tax on sales orders that Washington customers placed with Chicago Bridge's Illinois office. *Id.* at 817. Because the

14

negotiation and formalization of these contracts occurred outside Washington, Chicago Bridge argued that they were not taxable sales activities within Washington. *Id.* We disagreed. We found there was sufficient nexus between Chicago Bridge's sales and its in-state activities, especially when Chicago Bridge custom designed and manufactured each product for installation in Washington, opened a local office in Seattle from which it would send employees and project managers to survey project sites during the design and installation process, and maintained a warehouse in Tacoma for storage and access to equipment that would be used in the installation and maintenance of these sales. *Id.* at 818-19. From these facts, we held that Chicago Bridge had failed to carry its burden of proving dissociation of its out-of-state sales from its in-state activities, as they helped it maintain a market for its products in Washington. *Id.* at 828-29. We reasoned that "although the Seattle sales office was not involved in the contract procurement, it was involved in the passive sense of being present, aware of the transaction, and available to assist if necessary. Local [Chicago Bridge] personnel were also available to resolve any difficulties with the product and maintain the goodwill of the customer." *Id.* at 828.

In so holding, we interpreted *Norton* to require that a company show a complete absence of any connection between the local office and the underlying sales in order to meet its burden. *Id.* at 821, 833. Thus, where there is general contact between the taxpayer's in-state employees and its customers related to the taxpayer's products, a claim that such sales are dissociated will fail. *Id.* at 821-22 (citing *Standard Pressed Steel* and *General Motors*). This is because the presence and activities of these

15

employees help the taxpayer build rapport and retain goodwill with its customers and are therefore too "inexorably entwined with the establishing and holding of the local market" to be "dissociated." *Id.* at 833-34, 837.

Most recently, we confirmed our interpretation of *Norton*'s nexus requirement in *Lamtec*, 170 Wn.2d 838. In *Lamtec*, a New Jersey manufacturer sold products to customers in Washington wholesale by telephone. Lamtec's only presence in Washington was through three sales representatives, who visited with its major Washington customers two to three times per year. Without deciding whether a physical presence in the taxing state was necessary, rather than sufficient, to establish nexus, we held that even if a physical presence was required, it was satisfied by the three sales representatives' occasional visits to Washington. Even though the sales representatives did not solicit the sales in question, we reasoned that "[t]he contacts by Lamtec's sales representatives were designed to maintain its relationships with its customers and to maintain its market within Washington State. Nor were the activities slight or incidental to some other purpose or activity." *Id.* at 851. We went on to hold that "Lamtec's practice of sending sales representatives to meet with its customers within Washington was significantly associated with its ability to establish and maintain its market." *Id.*

Additionally, our construction of *Norton* is consistent with decisions from other jurisdictions. In *Alaska Department of Revenue v. Sears, Roebuck & Co.*, Sears challenged the imposition of a gross receipts tax on direct mail order sales—delivered to Alaska—that did not utilize the local Sears retail outlets. 660 P.2d 1188, 1189 (Alaska

16

1983). The Alaska Supreme Court held that *Norton* and the dormant commerce clause did not bar the imposition of the tax, even if the direct mail orders in no way involved a local outlet, because the local outlets "provided Alaska patrons with customer service on catalog items, such as returns for repair, credit, or exchange. In addition, they supplied application forms and accepted direct applications for Sears credit card accounts." *Id.* at 1191. The court held that under those facts, Sears had a "substantial commercial presence" that had "a significant nexus to Sears' direct mail order business." *Id.* In *J.C. Penney Co. v. Hardesty*, the Supreme Court of West Virginia held a B&O tax on J.C. Penney's out-of-state catalog sales valid, even though the sales were neither made nor shipped through its local retail outlets. 264 S.E.2d 604, 610 (W. Va. 1979). In a concurring opinion, Justice Miller stated that "to contend that out-of-State catalog sales have no local connection is to ignore business reality." *Id.* at 617.

The parties spend a portion of their briefing arguing over whether *General Motors, Standard Pressed Steel,* and *Tyler Pipe* overruled *Norton.* However, resolution of that question is not dispositive of the issue. While the United States Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio,*" we need not resolve this question today. *Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 18, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000). *Norton* unquestionably remains good law as pertains to the principle that the taxpayer has the burden to show that the bundle of its in-state corporate activities are "dissociated from the local business and interstate in nature. The general rule, applicable here, is that a taxpayer claiming immunity from a tax has the

burden of establishing [its] exemption." *Norton*, 340 U.S. at 537. What has changed in the 60 years since *Norton* is the Supreme Court's interpretation of how a company must demonstrate dissociation. In that, *General Motors, Standard Pressed Steel,* and *Tyler Pipe* control.

Here, Avnet admits that its "Redmond office performs a variety of functions for Avnet's Washington customers, including soliciting orders, responding to requests for quotes, receiving orders, responding to questions and otherwise meeting the needs of Avnet's Washington customers." Avnet, Inc.'s Suppl. Br. at 2. Although Avnet contends that its Redmond office did not provide any postshipment services related to the drop-shipped or national sales, it does not indicate that it would not do so if requested. In *Chicago Bridge*, we indicated that it was enough that the local office was involved in the "passive sense of being present, aware of the transaction, and available to assist if necessary." 98 Wn.2d at 828-29. In addition, Avnet's employees in the Redmond office also provided its corporate office with "market intelligence" regarding Washington markets, met with Avnet's sales teams and suppliers to strategize on how to create a greater demand for Avnet's products and services, and worked with customers in improving existing products and designing new prototypes. CP at 353-55. Avnet has failed to offer any evidence that those local activities in Washington are not significantly associated with its ability to establish and maintain a Washington market even when its local office or employees are not directly involved with the inbound sales. Avnet's in-state activities therefore were at least minimally associated with its ability to establish

and maintain a market in Washington for the sale of its products. Avnet's presence creates a climate for Washington residents to want to order from the company. We hold that under *Tyler Pipe* and *Chicago Bridge*, there is a sufficient nexus between Avnet's in-state activities and the State to support Washington's imposition of its B&O tax on the gross receipts derived from all of Avnet's inbound sales.

<u>Rule 193</u>

We now turn to Avnet's argument that Rule 193 bars the imposition of a B&O tax on both categories of sales. Avnet first argues that Rule 193(7), which states that "Washington does not assert B&O tax on sales of goods which originate outside this state unless the goods are received by the purchaser in this state and the seller has nexus," exempts its drop-shipped sales. Avnet contends that even if there is a nexus, its buyer never received possession or exercised control or dominion over the goods. Avnet further argues that a B&O tax on its national and drop-shipped sales are barred by Rule 193(7)(c), claiming that none of the nonexclusive examples of nexus set forth in Rule 193(7)(c)(i)-(vi) are applicable. Avnet next asserts that the Department has disavowed its own interpretive rule and should be estopped from so doing. The Department argues that it has not disavowed anything, but that Avnet misconstrues Rule 193. We agree with the Department.

The plain language of Rule 193(7) does not provide Avnet with an exemption. First, the rule defines "received" as the "purchaser *or its agent* . . . taking physical possession of the goods or having dominion and control over them." Rule 193(2)(d)

(emphasis added). "Agent" is then defined as "a person authorized to receive goods with the power to inspect and accept or reject them." Rule 193(2)(e). As the Department argues, the only person "authorized to receive [the] goods with the power to inspect and accept or reject them" would be the person Avnet's buyer designates—Avnet's buyer's customer—bringing them squarely within the rule's definition of "agent." Rule 193(2)(e). For each sale at issue, Avnet's customer contracted to pay for the goods and provided Avnet with the name and address of the person or company authorized to receive the goods. Furthermore, as the Court of Appeals below correctly pointed out, "the only transfer of possession of property to any buyer occurred within the state of Washington." *Avnet*, 187 Wn. App. at 436. The person designated by Avnet's customer to receive the goods was the customer's "agent" as defined in Rule 193.

However, even if the company that places the order and requests it be drop-shipped to Washington is not the purchaser—that would make the ultimate recipient the purchaser and Avnet's customer the purchaser's agent. A commonsense breakdown of a drop-shipped sale demonstrates that the "purchaser" is the ultimate recipient in Washington. Avnet and the Department treat the sale as beginning with the out-of-state company placing an order with Avnet. However, the out-of-state company is presumably placing the order with Avnet only because it first received an order from its customer in Washington. For example, a Washington customer orders a piece of electronic equipment from a company located in Colorado. The Colorado company then places an order with Avnet and requests it be delivered to its customer in Washington. The

20

payment for Avnet's product originates in Washington, and the product is delivered in Washington. If the Colorado company is not the purchaser, then it must be acting as an agent of the Washington customer. The result is that the ultimate recipient in Washington is, for all intents and purposes, the purchaser of Avnet's goods. Depending where we place the focus, the Washington customer is either the commonsense purchaser or the agent of the purchaser. Regardless, Rule 193 is satisfied.

The common law also supports our interpretation that the Washington customer is Avnet's de facto purchaser. "[I]t is a well-established rule that delivery to a person appointed by the buyer to receive the goods or to any third person at the buyer's request or with his consent is sufficient delivery to the buyer." *Middleton v. Evans*, 86 Utah 396, 403, 45 P.2d 570 (1935); *Weiner v. Am. Credit-Indem. Co. of N.Y.*, 222 N.W. 699, 701 (Mich. 1929) ("It is not unusual in business for orders to direct delivery to be made to a party other than the one giving the order, and a delivery so made is in legal effect a delivery to the party ordering the shipment.")[5]

---

[5] *See also Williamsburgh Stopper Co. v. Bickart*, 104 Conn. 674, 134 A. 233 (1926) (delivery to the buyer's customers in accordance with his instructions is delivery to the buyer); *Francis v. Merkley*, 59 Cal. App. 196, 198, 210 P. 437, 438 (1922) (delivery to purchaser's designee deemed delivery to purchaser for purpose of consummating contract of sale); *Fergus Cnty. Hardware Co. v. Crowley*, 57 Mont. 340, 343, 188 P. 374 (1920) ("[I]t is too well-settled to be open to question that delivery of goods to one designated by the buyer to receive them is delivery to the buyer himself."); *Roy v. Griffin*, 26 Wash. 106, 66 P. 120 (1901) (delivery to shipper designated by purchaser constituted delivery to purchaser for purposes of consummating a sale of lumber); *Wing v. Clark*, 24 Me. 366, 373 (1844) ("The cases are numerous, which show that, a delivery of an article sold, to a person appointed by the vendee to receive it, is a delivery to the vendee.").

Finally, it is worth noting that Avnet's interpretation of Rule 193 creates a class of "nowhere sales" that because the goods are not physically received by the purchaser cannot be classified as inbound or outbound sales. Avnet's interpretation results in no sale occurring, and is inconsistent with the language of the B&O statutes and the legislature's intent that the B&O tax apply to virtually every business activity and to the extent permitted by the constitution.[6] The legislature did not intend the applicability of the B&O tax to turn on whether the purchaser designates a third party to take possession of the goods at the shipping destination. This is especially true when that designation is completely within the control of the parties and could lead to substantial tax avoidance. *Cf. Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 556, 252 P.3d 885 (2011) (independent contractor could not avoid its B&O tax obligation by purporting to disclaim an ownership interest in the amounts owed for services rendered); *Ford Motor*, 160 Wn.2d at 43-44 (out-of-state seller could not avoid B&O tax by contractually transferring title at the point of shipment); *Chi. Bridge*, 98 Wn.2d at 824 (construction contractor could not avoid B&O tax by bifurcating the design and manufacturing components of contracts for construction services from the installation of products in Washington); *Wasem's, Inc. v. State*, 63 Wn.2d 67, 69-70, 385 P.2d 530 (1963) (retailer could not avoid state excise taxes by having a nonresident purchaser sign a bill of lading agreeing to deliver goods to himself at a point outside the state). Properly interpreted,

---

[6] Avnet's interpretation would even bar the imposition of a B&O tax on orders placed by a Washington company through the Redmond office and sent to Arizona for fulfillment, so long as the Washington company directed that the goods be delivered to someone else in Washington.

Rule 193 ensures that the B&O tax avoids both multiple taxation and no taxation anywhere.

Avnet and the dissent rely on one of the specific examples given in Rule 193(11)(h) to assert that Avnet's buyer does not receive the goods under the meaning of the rule. Rule 193(11)(h) provides:

> Company X is located in Ohio and has no office, employees, or other agents located in Washington or any other contact which would create nexus. Company X receives by mail an order from Company Y for parts which are to be shipped to a Washington location. Company X purchases the parts from Company Z who is located in Washington and requests that the parts be drop shipped to Company Y. Since Company X has no nexus in Washington, Company X is not subject to B&O tax or required to collect retail sales tax. Company X has not taken possession or dominion or control over the parts in Washington. Company Z may accept a resale certificate from Company X which will bear the registration number issued by the state of Ohio. Company Y is required to pay use tax on the value of the parts.

Avnet maintains that it is "Company Z," its buyer is "Company X," and its buyer's customer is "Company Y." This example is not on point. First, it addresses the tax liability not of Avnet (Company Z), but of Avnet's buyer (Company X), which is not at issue. Second, the fact that Avnet's immediate customer (Company X) did not take possession of the products in Washington is not determinative. Again, "the only buyer who took possession or delivery did so from Avnet and in Washington." *Avnet*, 187 Wn. App. at 438. Rule 193(11)(h) is therefore not helpful.

We hold that Rule 193(7) does not exempt Avnet's drop-shipped sales. Likewise, Avnet will find no exemption in the examples listed in Rule 193(7)(c)(i)-(vi). First, regardless of the examples, subsection (7)(c) deals with nexus, and "nexus" is defined as

"the activity carried on by the seller in Washington which is significantly associated with the seller's ability to establish or maintain a market for its products in Washington." Rule 193(2)(f). As previously discussed, Avnet's in-state activities meet this standard. Avnet attempts to evade this conclusion by arguing that subsection (2)(f) pertains to "taxpayer nexus," whereas subsection (7)(c) relates to "transactional nexus." Avnet, Inc.'s Suppl. Br. at 17 n.9. Under Avnet's interpretation, subsection (7)(c) would be sale specific. However, Avnet's distinction between subsections (2)(f) and (7)(c) ignores language from (7)(c) that provides that the nexus will be deemed to exist for taxing purposes for up to five years even when the in-state activity has ceased. This undermines the interpretation that Avnet advances, which would require a transaction-by-transaction nexus determination. Second, one of the examples listed states that there is a sufficient nexus if

> "[t]he out-of-state seller, either directly or by an agent or other representative, performs significant services in relation to *establishment or maintenance of sales into the state*, even though the seller may not have formal sales offices in Washington or the agent or representative may not be formally characterized as a 'salesperson'."

Rule 193(7)(c)(v) (emphasis added). This example is an iteration of the *Tyler Pipe* standard, and Avnet's activities fall squarely within it. We hold that Rule 193, which interprets Washington's B&O tax statutes, does not bar the imposition of a gross receipts tax on Avnet's national and drop-shipped sales.[7]

---

[7] The Department's reading of Rule 193, which interprets the B&O taxing statutes, is correct. Therefore, it is unnecessary to determine whether the Department disavowed an interpretive rule and whether it should be estopped from doing so if a taxpayer relies on it.

## CONCLUSION

Washington's B&O tax is intended to extend as far as permitted by the dormant commerce clause and to reach "virtually all business activities carried on within the state." *Time Oil*, 79 Wn.2d at 146. The dormant commerce clause would permit Avnet to dissociate its national and drop-shipped sales if it could show that the bundle of its corporate in-state activities were not "'significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" *Tyler Pipe*, 483 U.S. at 250 (quoting *Tyler Pipe*, 105 Wn.2d at 323). During the time in question, Avnet had an office in Redmond, Washington, with over 40 employees consisting of account managers, sales and marketing representatives, engineers, and technology consultants. The Redmond office was significantly associated with establishing and holding the market for its products in Washington, and therefore we hold that the dormant commerce clause does not prevent the imposition of a B&O tax. Furthermore, we hold that the plain language of Rule 193 does not bar the B&O tax. The Court of Appeals is affirmed.

No. 92080-0

_Madsen, C.J._

WE CONCUR:

_Wiggins, J._

_Owens, J._

_Fairhurst, J._

26

GONZÁLEZ, J. (concurring)—I concur with the lead opinion in result. Neither the dormant commerce clause nor the Department of Revenue's former "Rule 193" (former WAC 458-20-193 (1992)) preclude imposition of business and occupation (B&O) tax on Avnet's national and drop-shipped sales. U.S. CONST. art. I, § 8, cl. 3. I write separately to stress that for B&O taxation purposes, the "purchaser" in Rule 193 is the entity that ultimately takes possession of goods in Washington, regardless of the fact that there was a broker in the middle who placed the order on behalf of the ultimate purchaser.

The Washington Legislature manifested a clear intent to impose the B&O tax on virtually all business activities carried on in the State. *Time Oil Co. v. State*, 79 Wn.2d 143, 483 P.2d 628 (1971). Washington courts have repeatedly ruled that the B&O tax applies to all business activities not expressly excluded. *Id.* Construing "purchaser" as narrowly as the dissent advocates would be inconsistent with the relevant regulations, the legislature's expressed intent, and our precedent finding B&O taxation covers virtually every business activity in Washington. Rule

1

193(7); RCW 82.04.220; *Steven Klein, Inc. v. Dep't of Revenue*, 183 Wn.2d 889, 896, 357 P.3d 59 (2015) ("Washington's B&O tax system is extremely broad."); *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149-50, 3 P.3d 741 (2000); *Budget Rent-A-Car of Wash.-Or., Inc. v. Dep't of Revenue*, 81 Wn.2d 171, 500 P.2d 764 (1972); *Time Oil Co.*, 79 Wn.2d 143.

Washington does not assert B&O tax on sales of goods originating outside the state unless the goods are received by the purchaser in our state and the seller has a sufficient nexus to our state. Rule 193(7). Avnet has a nexus with the state because its in-state activities were not separate and independent from its sales to Washington customers. *See Norton Co. v. Dep't of Revenue*, 340 U.S. 534, 71 S. Ct. 377, 95 L. Ed. 517 (1951); *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964), *overruled on other grounds by Tyler Pipe Indus., Inc., v. Wash. State Dep't of Revenue*, 483 U.S. 232, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987); *Standard Pressed Steel v. Dep't of Revenue*, 419 U.S. 560, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975); *Tyler Pipe*, 483 U.S. 232; *Chi. Bridge & Iron Co. v. Dep't of Revenue*, 98 Wn.2d 814, 816-17, 659 P.2d 463 (1983). The goods at issue in Avnet's drop-shipped sales were received by the purchaser in our state because the entity ultimately taking possession of those goods was a Washington purchaser, regardless of the fact that there was a facilitator elsewhere. Construing "purchaser" to encompass the ultimate Washington purchaser follows our

precedent and follows the legislature's clear intent to impose B&O tax on virtually all business in our state.

With these observations, I join the lead opinion in result.

González, J.

Yu, J

No. 92080-0

GORDON McCLOUD, J. (dissenting)—Washington's business and occupation (B&O) tax falls on wholesalers "for the act or privilege of engaging in business activities" inside our state. RCW 82.04.220(1). The lead opinion upholds the imposition of this tax on two categories of sales that, in this case, were indisputably made by Avnet outside our state: national sales and third party drop-shipped sales. It rejects Avnet's arguments that the tax on those interstate sales fell outside the reach of RCW 82.04.220, was impermissible under former WAC 458-20-193 (1992) (Rule 193), and violated the dormant commerce clause, U.S. CONST. art. I, § 8, cl. 3.

I disagree with the lead opinion's conclusion on each of those points. There is no statute or regulation that "state[s] distinctly" that these two categories of interstate sales are "the object of th[at] [B&O tax law] to which only it shall be applied" as required by article VII, section 5 of our state constitution. In fact, imposing that tax on Avnet's third party drop-shipped sales violates Rule 193, which bars taxation of such out-of-state sales unless the product is received *by the*

1

*purchaser* in Washington. Such receipt by the purchaser in Washington did not occur here; in third party drop-shipped sales, it is not the purchaser but the *purchaser's customer*, an independent entity, who receives the product in Washington. Finally, in *Norton*,[1] the United States Supreme Court rejected state efforts to impose a similar B&O tax on analogous interstate sales; it held that those sales were sufficiently "dissociated" from the company's in-state activities to bar local state taxation of those sales under the dormant commerce clause. *Norton* remains binding precedent. I therefore respectfully dissent.

PROCEDURAL HISTORY

The question presented in this case is a difficult one. The courts below reached different conclusions, as summarized below. That's certainly a red flag, given (1) our interpretive rule that ambiguous tax statutes or regulations are construed in the taxpayer's favor and (2) the state constitutional requirement that "every law imposing a tax shall state distinctly the object of the same to which only it shall be applied." WASH. CONST. art. VII, § 5. I therefore summarize the background of this case in detail.

---

[1] *Norton Co. v. Dep't of Revenue*, 340 U.S. 534, 537, 539, 71 S. Ct. 377, 95 L. Ed. 517 (1951).

2

A. The Department of Revenue Determined That Avnet Was Liable for B&O Taxes on Both National and Drop-Shipped Sales

The Department of Revenue (Department) audited Avnet's taxes and concluded that from January 1, 2003, to December 31, 2005, Avnet underreported its B&O tax liabilities. In particular, the Department found that Avnet failed to include national and drop-shipped sales in its tax filings. Avnet agrees that it did not report these as taxable events, but it argues that it had no duty to report them. Avnet explained that they were considered nontaxable incidents under the Department's Rule 193 and the dormant commerce clause. According to Avnet, national and drop-shipped sales are excluded from state B&O tax liability because they were "dissociated" (i.e., lacked transactional nexus) from its Redmond office. Clerk's Papers (CP) at 6. Avnet claims it engaged in no activity in Washington associated with these sales—no soliciting, no taking or receiving of orders, no warehousing, no shipping, no billing, no customer service, and no technical calls.

The Department auditor accepted Avnet's factual assertions but disagreed with its legal conclusion. It assessed Avnet $556,037 in taxes and interest ($509,256 in back taxes plus $46,781 in interest).

3

B. The Administrative Appeals Division of the Department Affirmed the Department's Tax Assessment

Avnet raised the same arguments in its administrative appeal. The administrative law judge rejected them. The administrative law judge denied Avnet's claims under Rule 193(7) and its claims of dissociation under the dormant commerce clause because Avnet had failed to show that its national and drop-shipped sales were not attributable to its in-state activities in any way. According to the judge, "[i]t is not just a question of segregating the activities of specific sales offices, but rather establishing that a sale attributed to out-of-state location is *not in any way associated* with the taxpayer's collective in-state activities that maintain a market for that product." CP at 100 (emphasis added). The judge upheld the Department's tax assessment.

That judge then granted Avnet's motion for reconsideration. During the rehearing, Avnet produced additional evidence detailing the amount of each disputed sale, the branch that wrote the sale, the buyer and state of location, and the receiver. After reviewing this evidence, the judge once again affirmed the Department's tax assessment.

Avnet paid the accrued tax assessment of $660,999.54 ($556,037.00 plus $104,962.54 in additional interest) under protest and filed a refund action in Thurston County Superior Court based on the same challenges.

4

C. The Thurston County Superior Court Granted Avnet a Tax Refund on Drop-Shipped Sales, but Not National Sales

The superior court agreed with Avnet that drop-shipped sales were not subject to Washington's B&O tax under Rule 193(7) and ordered the Department to refund Avnet $371,042 plus any interest Avnet paid on it. But it disagreed with Avnet's contention that Rule 193(7)(c) or the dormant commerce clause barred taxes on the national sales. As to those sales, the court ruled that there was a sufficient local nexus to impose tax liability.

D. The Court of Appeals Held That Both National Sales and Drop-Shipped Sales Were Subject to B&O Taxation

Avnet appealed its continued tax liability for national sales, and the Department cross appealed the dismissal of its tax assessments on the drop-shipped sales. Division Two of the Court of Appeals held that Avnet's B&O tax liability included national and drop-shipped sales. *Avnet, Inc. v. Dep't of Revenue*, 187 Wn. App. 427, 448-49, 348 P.3d 1273 (2015), *review granted*, 184 Wn.2d 1026, 364 P.3d 120 (2016).

Regarding Avnet's tax liability for national and drop-shipped sales, the appellate court acknowledged that older decisions from this court and the United States Supreme Court had held that similar sales were sufficiently dissociated from a defendant's in-state activities to avoid state B&O tax liability. *Id.* at 444-45

5

(discussing *Norton*, 340 U.S. at 539; *B.F. Goodrich Co. v. State*, 38 Wn.2d 663, 673-76, 231 P.2d 325 (1951)). But it concluded that those cases' precedential authority had been eroded by subsequent Supreme Court decisions directing courts to consider more than just the involvement of the local office in procuring the sale, but also the taxpayer's other in-state activities that supported an in-state market for its out-of-state sales. *Id.* at 445-47 (discussing *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 250-51, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987); *Standard Pressed Steel Co. v. Dep't of Revenue*, 419 U.S. 560, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975); *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 447-48, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964), *overruled on different grounds by Tyler Pipe*, 483 U.S. at 242-48)).

The appellate court also rejected Avnet's contention that Rule 193 barred B&O taxation of its drop-shipped and national sales. It concluded that Rule 193 was not binding on the court. *Id.* at 439 (discussing *Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 446-47, 120 P.3d 46 (2005)).

Avnet petitioned this court for review, which we granted. 184 Wn.2d 1026.

## ANALYSIS

Washington imposes a tax on businesses, called a B&O tax, "for the act or privilege of engaging in business activities" in Washington. RCW 82.04.220(1). It

6

is measured by the business' gross receipts. Former RCW 82.04.220 (1961). That tax is distinct from, and in addition to, any retail sales tax or use tax. The B&O tax applies to sales that originate within the state and some sales that originate outside—depending on where the goods are received by the purchaser. Rule 193(7) (tax applies to inbound sales), (3) (tax does not apply to outbound sales even though they originate in state). This case involves two categories of inbound sales: sales where the recipient is a business entity linked to the customer (national sales) and sales where the recipient is a completely separate third party, such as the beneficiary of a gift or the purchaser's customer (third party drop-shipped sales).

Controlling Supreme Court precedent compels the conclusion that the dormant commerce clause bars states from taxing both out-of-state sales.

A. *Norton* Remains Controlling Authority and Requires That We Reach the Same Result Based on the Same Facts

The United States Constitution prohibits states from taxing interstate commerce if the tax infringes on Congress' express authority "[t]o regulate commerce . . . among the several states." U.S. CONST., art. I, § 8, cl. 3. This "commerce clause" has historically been viewed as both an express grant of congressional authority to regulate and an implicit restriction on a state's authority to enact legislation that discriminates against or excessively burdens interstate commerce. *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 844, 246 P.3d 788

7

(2011). This case implicates the commerce clause's implied restriction, the dormant commerce clause.

A tax on interstate commerce does not violate the dormant commerce clause if "'[(1)] the tax is applied to an activity with a substantial nexus with the taxing State, [(2)] is fairly apportioned, [(3)] does not discriminate against interstate commerce, and [(4)] is fairly related to the services provided by the State.'" *Ford Motor Co. v. City of Seattle, Exec. Serv. Dep't*, 160 Wn.2d 32, 48, 156 P.3d 185 (2007) (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977)). "If a local taxing scheme fails any one of these four requirements, it is invalid." *Id.*

The parties disagree whether the first requirement, of a "substantial nexus with the taxing state," is satisfied. That "substantial nexus" requirement actually involves two separate, though related, nexus requirements: the first concerns the "taxpayer's [general] business activities within the State," or general business nexus, and the second concerns the specific transaction at issue, or specific transactional nexus. *Gen. Motors*, 377 U.S. at 441 (recognizing the test for business nexus is distinct from transactional nexus and its test for dissociation); *Norton*, 340 U.S. at 537 (where corporation has general presence in state, it "can avoid taxation on [in-

8

state] sales only by showing that *particular transactions are dissociated from the local business* and interstate in nature" (emphasis added)).

To establish business nexus, the tax must be based on "'the activities performed in [the taxing] state on behalf of the taxpayer [that] are significantly associated with the taxpayer's ability to establish and maintain a market in [that] state for the sales.'" *Tyler Pipe*, 483 U.S at 250-51 (quoting *Tyler Pipe v. Dep't of Revenue*, 105 Wn.2d 318, 323, 715 P.2d 123 (1986)). Once sufficient business nexus is shown, "'a taxpayer claiming immunity from a tax has the burden of establishing [an] exemption.'" *Gen. Motors*, 377 U.S. at 441 (quoting *Norton*, 340 U.S. at 537). A particular transaction can be exempt from B&O taxation even though the business has nexus in Washington if that transaction is "dissociated from the local business and interstate in nature." *Norton*, 340 U.S. at 537.[2]

Avnet concedes that it has a business nexus with Washington based on the presence of its Redmond office. Hence, Avnet does not challenge the Department's authority to tax transactions facilitated by that office. Indeed, Avnet has paid B&O

---

[2] Rule 193 incorporates the same constitutional requirements of business and transactional nexus into its prerequisites to the occurrence of a taxable event. Rule 193(7)(c) ("Washington does not assert B&O tax on sales of goods which originate outside this state unless . . . the seller has nexus"; "[i]f a seller carries on significant activity in this state and conducts no other business in the state except the business of making sales, this person has the distinct burden of establishing that the in[-]state activities are not significantly associated in any way with the sales into this state").

taxes on all those transactions.

Instead, Avnet argues that two categories of interstate sales—its national and third party drop-shipped sales—are so dissociated from the activities of its Redmond office that they lack transactional nexus and are exempt from B&O taxation for that reason.[3] Avnet relies on the United States Supreme Court's decision in *Norton* for that argument.

*Norton*, like Avnet, was an out-of-state corporation that operated a local retail office and warehouse in state, where it sold and distributed goods directly to local customers. *Norton*, 340 U.S. at 535. Norton, like Avnet, also hired local engineers to consult with its in-state customers. *Norton Co. v. Dep't of Revenue*, 405 Ill. 314, 315, 90 N.E.2d 737 (1950). And Norton, like Avnet, challenged the State's ability to impose a B&O tax on the portion of its Washington sales derived from orders received directly and fulfilled directly by its out-of-state warehouses and without the assistance of its local employees or facilities in any way. *Norton*, 340 U.S. at 535-36. Based on these facts, the Court held that those interstate sales were sufficiently "dissociated" from Norton's in-state activities to be constitutionally exempt from

---

[3] The lead opinion claims that *General Motors* and its progeny drew no distinction between these two inquiries. Lead opinion at 8 n.2. This is incorrect. In *General Motors* itself, General Motors "admitted" that its activities satisfied the first inquiry. *Gen. Motors*, 377 U.S. at 441. The only disputed question was whether certain specific transactions by four of its divisions could be taxed—i.e., whether the transactions by those divisions showed sufficient nexus.

10

B&O taxation under the dormant commerce clause. *Id.* at 536.

This case involves the exact same facts. Everyone agrees—Avnet, the Department, and even the lead opinion—that *Norton* is factually indistinguishable. Avnet, Inc.'s Suppl. Br. at 6-11; Resp't Dep't of Revenue's Suppl. Br. at 11, 13; lead opinion at 17. Yet the lead opinion concludes that *unlike* Norton, Avnet *is* subject to B&O taxation for those same sort of out-of-state sales. Lead opinion at 18. The lead opinion reaches this contrary conclusion by interpreting several subsequent United States Supreme Court decisions as raising *Norton*'s standard for proving dissociation. *Id.* at 17-18. Specifically, it relies on *General Motors, Standard Pressed Steel,* and *Tyler Pipe.*

None of those cases support the lead opinion's conclusion.

First, *Tyler Pipe* is a case about business nexus, not transactional nexus. 483 U.S. at 249 ("Tyler argues that its *business* does not have a sufficient nexus with the State of Washington to justify the collection of a gross receipts tax" (emphasis added)).[4] Nowhere in *Tyler Pipe* did the Court discuss the concept of dissociation

---

[4] The lead opinion argues that *Tyler Pipe* drew no distinction between general business nexus and specific transaction nexus. That's because it didn't have to; the only disputed issue there, unlike the issue in *General Motors, Norton,* and the instant case, was whether *Tyler Pipe* had enough general business connections with the State.

11

or *Norton*. So that case is inapplicable here.[5]

Second, contrary to the lead opinion's opinion, both *General Motors* and *Standard Pressed Steel* support applying the "dissociation" test as it was articulated in *Norton*, and not some modified standard of proof. Indeed, both cases repeatedly cited to *Norton* as the standard for evaluating whether a disputed transaction is sufficiently dissociated. *Gen. Motors*, 377 U.S. at 441, 447-48; *Standard Pressed Steel*, 419 U.S. at 562-63.

In *General Motors*, the Court reached a different result from *Norton* because the facts were different: it found there was a significant relationship between General Motors' (GM) in-state sales activities and the disputed transactions. In *General Motors*, GM sought to exempt all sales where the orders were placed by Washington dealers directly with its Portland office and fulfilled by an out-of-state facility despite the significant contacts between GM's in-state employees and those dealers. 377 U.S. at 443, 446. GM argued that *Norton* controlled because in its case, as in *Norton*, customers ordered directly from out-of-state offices and their orders were

---

[5] The lead opinion's reliance on *Lamtec* is misplaced for this same reason. Like *Tyler Pipe*, *Lamtec* is a case about business nexus, not transactional nexus. Specifically, "Lamtec argue[d] that an entity has sufficient nexus with Washington for purposes of the B&O tax only if it has a 'physical presence' here and contends that it does not have such a presence." 170 Wn.2d at 844. Thus, contrary to the lead opinion's assertion, *Lamtec* did *not* address *Norton* and did *not* endorse some modified standard for what constitutes sufficient dissociation. Lead opinion at 16.

fulfilled by out-of-state facilities. The Court rejected GM's analogy, explaining that *Norton* was about more than just where the order was placed and where the product was fulfilled; it was about the absence of any contact between the taxpayer's in-state employees and the particular transaction. *Id.* at 447. The Court concluded that GM had failed to prove those orders were dissociated from its in-state activities. On the contrary, the facts showed that GM hired a significant number of Washington employees whose only jobs were to facilitate and assist those Washington dealers with determining what products to order and training those dealers' employees on how to use those products. *Id.* at 443-46. On those facts, the Court could not say the sales were unrelated to GM's in-state activities. So the difference between *Norton* and *GM* was the facts, not the legal rule.

The Court reached a different result from *Norton* again in *Standard Pressed Steel*. But that different result was also based on different facts: the significant relationship between the taxpayer's in-state activities and the customer who placed the order. Standard Pressed Steel challenged Washington's authority to impose a B&O tax on sales orders placed by a Washington customer directly with an out-of-state office and then fulfilled by an out-of-state facility. 419 U.S. at 561. But unlike Norton, Standard Pressed Steel hired an employee whose sole job was to consult with that customer regarding its needs and product requirements. *Id.* The Court

13

found these facts to be more analogous to the facts of *General Motors* than to the facts of *Norton*. Once again, the difference between *Norton* and this later case was the facts, not the legal rule.

We have also recognized that *Norton* stands as controlling authority but reached a different result based on the facts of the particular transaction. *Chi. Bridge & Iron Co. v. Dep't of Revenue*, 98 Wn.2d 814, 659 P.2d 814 (1983). Chicago Bridge manufactured and installed large, custom-built, steel storage containers. *Id.* at 816. Like Norton, GM, and Standard Pressed Steel, Chicago Bridge challenged Washington's imposition of a B&O tax on orders placed by customers directly with an out-of-state sales office. *Id.* at 816-17. But unlike in *General Motors* and *Standard Pressed Steel*, where the employees had a significant relationship with the in-state customer, none of Chicago Bridge's local employees were involved in commencing or facilitating the in-state sales. *Id.* As a result, the facts seemed more similar to the facts in *Norton* than the facts in *General Motors* and *Standard Pressed Steel*. We nevertheless upheld Washington's authority to tax these sales, distinguishing these sales from the sale of fungible goods that were at issue in *Norton*. We explained that unlike the sale of ordinary goods, these sales involved custom-made structures specifically designed for installation in Washington, the future installation of which would require significant involvement from Chicago

14

Bridge's many in-state employees to complete by way of site surveys, site preparations, and assemblage. *Id.* at 818-19, 821-22.

Unlike in *General Motors*, *Standard Pressed Steel*, and *Chicago Bridge*, there is no way to distinguish the facts in this case from the facts in *Norton*. The parties agree that the cases are factually indistinguishable. There is no significant relationship between Avnet's Redmond employees and the out-of-state customers or in-state recipients. Further, Avnet sold fungible goods, not long-term construction or service projects. In light of the Supreme Court's repeated application of *Norton* as controlling authority, I conclude that its legal rule remains controlling where similar facts are presented. Following *Norton*, the disputed national sales and third party dropped-shipped sales are dissociated from Avnet's in-state activities. They are therefore exempt from B&O tax liability under the dormant commerce clause.

B. <u>Rule 193 Also Requires That the Goods Be Received by the Purchaser in Washington for the Sale To Be Taxable</u>

Rule 193 compels the same conclusion for a different reason. It requires more than just constitutional nexus for a taxable event. It states that "Washington does not assert B&O tax on sales of goods which originate outside this state unless the goods are received by the purchaser in this state and the seller has nexus." Rule 193(7). In other words, "[t]here must be both the receipt of the goods in Washington by the purchaser and the seller must have nexus for the B&O tax to apply to a

15

particular sale. The B&O tax will not apply if one of these elements is missing." *Id.*

Thus, even if there is constitutional nexus, the State cannot tax the transaction unless

"the purchaser" also took "receipt" of the goods in Washington.

It is undisputed that Avnet's national sales were received by an entity of the

purchaser in this state. So Rule 193 would permit the State to tax those sales if the

constitution permitted it.

But it is also undisputed that Avnet's third party drop-shipped sales were not

received by the purchaser in this state. They were received instead by an independent

entity in this state: the purchaser's customer or some other third party recipient.[6] The

question is whether the delivery of goods to such a third party recipient in

Washington qualifies as "the receipt of the goods in Washington *by the purchaser.*"

Rule 193(7) (emphasis added).

The lead opinion concludes that the answer must be yes—there must be some

interpretation of "purchaser" that includes the nonpurchasing third party recipient—

because the legislature intended to tax all constitutionally taxable events even if it

---

[6] The lead opinion misapprehends Avnet's argument, characterizing it as a claim that "the company that places the order and requests it be drop-shipped to Washington is not the purchaser." Lead opinion at 20. But Avnet is arguing the exact opposite position. Avnet is claiming that the company that places the order *is the purchaser* and that as a result, the goods are not received by the purchaser in Washington as required under Rule 193. Avnet, Inc.'s Suppl. Br. at 19.

didn't clearly say so in its statutes or regulations. The lead opinion therefore construes the rule liberally to find a taxable event. But that is inconsistent with our well-established rule that ambiguous tax statutes and regulations must be construed in the *taxpayer's* favor. *Seattle FilmWorks, Inc. v. Dep't of Revenue*, 106 Wn. App. 448, 453, 24 P.3d 460 (2001); *see also Estate of Bracken*, 175 Wn.2d 549, 563, 290 P.3d 99 (2012) (quoting *Lamtec*, 170 Wn.2d at 842-43).

In fact, that interpretive rule is constitutionally compelled. *See Bracken*, 175 Wn.2d at 563 (quoting Washington Constitution article I, section 5 in support of narrow construction).

It is only where the statute or regulation grants a tax *exemption* or *deduction* that we construe the language strictly, though fairly, in keeping with the ordinary meaning of its language, against the taxpayer. *Id.*[7] Avnet is not claiming a deduction or an exemption from an otherwise taxable event; it is claiming that the tax is inapplicable in the first place, per Rule 193. Thus, as the taxpayer burdened by the tax, Avnet should receive the benefit from any ambiguity.

But Rule 193 is not ambiguous. It defines "received" as meaning "the

---

[7] Although this case involves agency interpretations of statutes and regulations, the parties do not discuss what deference, if any, should be afforded to the Department's interpretation of tax statutes and its regulations. *See Chevron, USA, Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); *United States v. Mead Corp.*, 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001).

purchaser or its agent first either taking physical possession of the goods or having dominion and control over them." Rule 193(2)(d). This means the "receipt" requirement can be satisfied in one of two limited ways: the purchaser or its agent must have either possession over the goods in Washington or dominion and control over the goods in Washington. The example in subsection (11)(h) under Rule 193 explains that a drop-shipment purchaser (Company X) does not take possession in Washington or have dominion or control over the goods in Washington when it requests the goods purchased be delivered to a third party recipient (Company Y) in Washington. That example states:

> Company X is located in Ohio and has no office employees, or other agents located in Washington or any other contact which would create nexus. Company X receives by mail an order from Company Y for parts which are to be shipped to a Washington location. *Company X purchases the parts from Company Z who is located in Washington and requests that the parts be drop shipped to Company Y.* Since Company X has no nexus in Washington, Company X is not subject to B&O tax or required to collect retail sales tax. *Company X has not taken possession or dominion or control over the parts in Washington.* Company Z may accept a resale certificate from Company X which will bear the registration number issued by the state of Ohio. Company Y is required to pay use tax on the value of the parts.

Rule 193(11)(h) (emphasis added). If the purchaser (Company X) does not take possession of the goods in Washington when the goods were delivered to a third party designee (Company Y), it necessarily follows that the third party recipient is not an "agent" of the purchaser either because a company can take possession or

18

have dominion or control over the goods through either its employees or its agents. Rule 193(2)(d).

This conclusion is also consistent with the definition of "agent" under Rule 193, which requires, contrary to the lead opinion's opinion, more than just the authority to receive goods; an "agent" is "a person authorized to receive goods *with the power to inspect and accept or reject them.*" Rule 193(2)(e) (emphasis added).

In addition, this conclusion is in accord with internal e-mails from department employees acknowledging that they were advised to inform taxpayers that drop-shipped sales were not subject to Washington's B&O tax. It is certainly not fair to characterize Avnet's challenge as an attempt to circumvent taxation or exploit some tax loophole when the Department is the one who defined the taxable event to exclude sales where the goods are not received by the purchaser in Washington. *See* lead opinion at 21-22.

While it may have been "the legislature's intent that the B&O tax apply to virtually every business activity and to the extent permitted by the constitution," *id.* at 21-22, we cannot ignore the express language of Rule 193—a rule expressly promulgated by the Department and relied on by Washington businesses in making their business choices. Taxpayers "must be able to rely on the plain meaning of regulations and Department interpretations, without fear that a state agency will later

19

penalize them by adopting a different interpretation." *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 889-90, 154 P.3d 891 (2007). Not only would it be unfair to ignore the Department's own rules, the legislature requires that the Department follow its own promulgated rules. RCW 34.05.570(3)(h) (authorizing courts to grant relief where an agency order "is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency"). Thus, even if the legislature silently intended to exempt third party drop-shipped sales from B&O taxation (the issue the lead opinion addresses), the Department was still required to exempt those sales from taxation under its then-effective Rule 193.[8]

Finally, to the extent the lead opinion is concerned that application of Rule 193 would result in the exclusion of significant tax revenue, that concern has been addressed by the current version of Rule 193, WAC 458-20-193(301). That current version addresses in specific detail the application of the B&O tax to third party drop-shipped sales. *Id.* The application of this decision is therefore limited to a

---

[8] The question of whether this court is bound by Department rules is a different question from whether the Department must follow its own rules. The State's citation to *Coast Pacific Trading, Inc. v. Dep't of Revenue*, 105 Wn.2d 912, 916-17, 719 P.2d 541 (1986), is therefore unavailing. It relates to the former question; this case relates to the latter.

20

business's liability for past taxes based on a certain category of past sales involving third party drop shipments made during the period when Rule 193 applied.

## CONCLUSION

The United States Supreme Court's decision in *Norton* barred Washington from imposing its B&O tax on the portion of an out-of-state corporation's sales derived from orders placed with the out-of-state business and fulfilled by out-of-state warehouses without the assistance of the business's in-state employees. It held that the dormant commerce clause prohibited the state from taxing such interstate transactions because they were too "dissociated" from the taxpayer's in-state activities to justify the burden on interstate commerce. *Norton*, 340 U.S. at 537. Everyone agrees that the national sales and drop-shipped sales at issue in this case are factually indistinguishable from the interstate sales at issue in *Norton*. *Norton* therefore controls and bars application of Washington's B&O tax to the disputed transactions. Even if the tax were constitutionally permissible, it also violated Rule 193 to the extent it was applied to Avnet's third party dropped-shipped sales. Rule 193 requires that the goods purchased be received *by the purchaser* in Washington to constitute a taxable event in our state. By definition, third party drop-shipped sales are not received by the purchaser, but rather the purchaser's customer or some other third party recipient, in Washington. Finally, any ambiguity about whether

21

RCW 82.04.220 and Rule 193 extend Washington's B&O tax to the national and drop-shipped sales in this case must be resolved in favor of the taxpayer, not against it. WASH. CONST. art. VII, § 5; *Bracken*, 175 Wn.2d at 563.

I therefore respectfully dissent.

*Avnet v. Dep't of Revenue*, No. 92080-0
(Gordon McCloud, J., dissenting)

Gordon McCloud, J.

Johnson, J.

Stephens, J.

23